### WALKER et al. v. GLOBE NEWSPAPER CO.

(Circuit Court, D. Massachusetts. May 25, 1904.)

No. 1,412.

1. COPYRIGHT—MAPS—REMEDY FOR INFRINGEMENT.

Rev. St. § 4965 [U. S. Comp. St. 1901, p. 3414], imposing a penalty for infringement of the copyright of any map, picture, work of sculpture, etc., unlike section 4964, relating to books, does not give the proprietor a right to maintain a civil action at law to recover damages for the infringement, and. the exclusive right of property in such artistic productions being purely statutory, the remedy for infringement is limited to that prescribed by the statute, there being no common law of the United States which can be invoked to supplement such remedy.

At Law. Action to recover damages for infringement of copyright. On demurrer to declaration.

H. L. Boutwell, for plaintiffs.

William Quinby and Charles T. Gallagher, for defendant.

130 F.—38

HALE, District Judge. This case comes before the court on the defendant's demurrer to the plaintiffs' declaration. That declaration charges infringement of the plaintiffs' copyrighted map known as "Map of the Electric Railways of the State of Massachusetts, Accompanying the Report of the Railroad Commissioners, 1899." Under this declaration the plaintiffs seek to recover damages for an invasion of their copyright. They do not seek a forfeiture and penalty under section 4965 of the Revised Statutes of the United States [U. S. Comp. St. 1901, p. 3414]. The defendant sets out eight causes of demurrer. The vital question raised by demurrer is stated in the first ground: "That the statutes relating to copyrights provide no remedy by civil action on behalf of the owner of the copyright of the map." The plaintiffs admit that section 4965, relating to copyrights, does not give any action for damages for the piracy of any map or any other article therein mentioned; that section 4964 [U. S. Comp. St. 1901, p. 3413] provides such remedy only in case of books; that this form of action is not expressly given by the statutes of the United States relating to copyrights. But the plaintiffs urge with great force and ability that where a right, previously existing by the common law, is secured by a statute, which provides no remedy for its protection, common-law remedies are available. They insist upon the application of the rule that their ordinary common-law remedy is not taken away because a special one is given by the statute. Plaintiffs' declaration is drawn, then, for the purpose of enforcing their common-law rights. The question is thus brought clearly before the court whether they have any rights under the common law. The plaintiffs found their right of recovery under a common-law declaration upon principles laid down by the English courts. They urge that the statute of 8 Anne was a law similar to our copyright law in this respect: that it enacted that an author should have the sole right and liberty of printing his book for a limited number of years, and then affixed penalties for transgressing the law; that the act therefore vested property in literary works in the author for a limited period, and that it provided penalties for those who infringed the property. But plaintiffs urge that, in addition to these statute penalties, the courts of England allowed an action on the case for damages, on the ground that the law confers no right without a remedy to enforce it; and that, while forfeitures and penalties were provided for by the act, the provision for such forfeitures and penalties did not prevent an injured author, whose copyright had been infringed, from having damages at the common law. Plaintiffs base their contention largely upon Beckford v. Hood, 7 T. R. 620, in which Lord Kenyon, in an elaborate and famous decision, supported the common-law rights under an infringed copyright. Lord Kenyon said:

"Then, the statute having vested the right in the author, the common law gives the remedy by action on the case for the violation of it. Of this there could have been no doubt made if the statute had stopped there. But it has been argued that as the statute, in the same clause that creates the right, has prescribed a particular remedy, that and no other can be resorted to. And, if such appeared to have been the intention of the Legislature, I should have subscribed to it, however inadequate it might be thought. But their meaning in creating the penalties in the latter part of the clause in question certainly was to give an accumulative remedy. Nothing could be more incomplete as

a remedy than those penalties alone; for, without dwelling upon the incompetency of the sum, the right of action is not given to the party aggrieved, but to any common informer. I cannot think that the Legislature would act so inconsistently as to confer a right and leave the party whose property was invaded without redress. On the fair construction of this act, therefore, I think it vests the right of property in the authors of literary works for the times therein limited, and that consequently the common-law remedy attaches if no other be specifically given by the act."

The learned counsel for the plaintiffs urges that all the reasoning of Lord Kenyon in this famous decision applies in full force to the common-law rights of an author under section 4964 of the Revised Statutes of the United States [U. S. Comp. St. 1901, p. 3413]. It is clear that our copyright law provides a remedy by civil action to the owner of the copyright of a book, but does not provide any remedy in favor of the owner of the copyright of a map, under section 4965 [U. S. Comp. St. 1901, p. 3414]. Section 4964 provides that a person who infringes the copyright in a book shall forfeit every copy of his offending publication, "and shall also forfeit and pay such damages as may be recovered in a civil action." But section 4965 has no such provision. The portion of this section which is important in this case reads as follows:

"If any person, after the recording of the title of any map, chart, dramatic or musical composition, print, cut, engraving or photograph, or chromo, or of the description of any painting, drawing, statue, statuary, or model or design intended to be perfected and executed as a work of the fine arts, as provided by this act, shall, within the term limited, contrary to the provisions of this act, and without the consent of the proprietor of the copyright first obtained in writing, signed in presence of two or more witnesses, engrave, etch, work, copy, print, publish, dramatize, translate, or import, either in whole or in part, or by varying the main design, with intent to evade the law, or, knowing the same to be so printed, published, dramatized, translated, or imported, shall sell or expose to sale any copy of such map or other article, as aforesaid, he shall forfeit to the proprietor all the plates on which the same shall be copied, and every sheet thereof, either copied or printed, and shall further forfeit one dollar for every sheet of the same found in his possession, either printing, printed, copied, published, imported, or exposed for sale; and in case of a painting, statue, or statuary, he shall forfeit ten dollars for every copy of the same in his possession, or by him sold or exposed for sale."

It will be observed that this section provides for no action of damages, but provides for the forfeiture of every sheet of the offending map, chart, or drawing, and for the further forfeiture of one dollar for every sheet of the same found in the possession of the infringer; and this is the sum of all the relief provided by Congress for the infringement of a copyrighted map. This section has been repeatedly before the courts. It is a penal statute, and must receive a strict interpretation. This has been decided many years ago in Backus v. Gould, 7 How. 798, 12 L. Ed. 919. In construing this statute in Sarony v. Ehrich (C. C.) 28 Fed. 80, Judge Coxe said:

"No authority has been cited to sustain the proposition that when the piratical prints are out of the possession and beyond the control of the infringer the proprietor of the copyright can recover of him their value in an action at law. It would require an exceedingly strained construction—almost a distortion—of the act to make it fit the present circumstances. It is no answer to say that the remedy provided by law is ineffective; that the wrongdoer may escape the consequences of his infringement; that the opportunity for

redress diminishes in proportion to the success of the infringement, and ceases wholly when the wrong is fully consummated. These arguments might, with great propriety, be addressed to the lawmaking power, and Congress could, perhaps, be induced to render effectual by a few simple amendments provisions which, in their present form,· are so obviously defective and inadequate. With these considerations, however, the courts have nothing to do. They must deal with the law as it is, not as it ought to be."

In Bolles v. Outing Company, 175 U. S. 262, 20 Sup. Ct. 94, 44 L. Ed. 156, the Supreme Court held that in an action under this statute to recover the penalty of one dollar provided for every copy of engraving or photograph infringing the copyright of another, the plaintiff's recovery is limited to copies actually found in the possession of the defendant, and does not extend to copies sold and put in circulation. In that very recent case the whole body of American law is reviewed.

But the learned counsel for the plaintiffs contends that under the reasoning of Lord Kenyon in the English court, upon the statute of Anne, the rights of the plaintiffs, being secured by the statute which provides no adequate remedy, the common-law remedies are available. The vital and conclusive answer to enforcing this proposition in the federal courts is that there is no common law of the United States. In the famous case Wheaton v. Peters, 8 Pet. 591, 8 L. Ed. 1055, which is the leading and controlling case upon this whole subject, it is held, in construing the copyright law, that while a man is entitled to the fruit of his own labors, he can enjoy them only, except by statutory provision, under the rules of property which regulate society. Mr. Justice McLean, speaking for the Supreme Court, at page 657, 8 Pet., 8 L. Ed. 1055, said:

"But if the common-law right of authors were shown to exist in England, does the same right exist, and to the same extent, in this country? It is clear there can be no common law of the United States. The federal government is composed of twenty-four sovereign and independent states; each of which may have its local usages, customs, and common law. There is no principle which pervades the Union and has the authority of law that is not embodied in the Constitution or laws of the Union. The common law could be made a part of our federal system only by legislative adoption. The question respecting the literary property of authors was not made a subject of judicial investigation in England until 1760; and no decision was given until the case of Miller v. Taylor was decided in 1769. Long before this time the colony of Pennsylvania was settled. What part of the common law did Penn and his associates bring with them from England? The literary property of authors, as now asserted, was then unknown in that country. Laws had been passed regulating the publication of new works under license. And the King, as the head of the church and the state, claimed the exclusive right of publishing the acts of Parliament, the book of common prayer, and a few other books. No such right at the common law had been recognized in England when the colony of Penn was organized. Long afterwards literary property became a subject of controversy, but the question was involved in great doubt and perplexity; and a little more than a century ago it was decided by the highest judicial court in England that the right of authors could not be asserted at common law, but under the statute. The statute of 8 Anne was passed in 1710. Can it be contended that this common-law right, so involved in doubt as to divide the most learned jurists of England at a period in her history as much distinguished by learning and talents as any other, was brought into the wilds of Pennsylvania by its first adventurers? Was it suited to their condition? But there is another view still more conclusive. In the eighth section of the first article of the Constitution of the United States it is declared that Congress shall have power 'to promote the progress of science and useful arts,

by securing, for limited times, to authors and inventors, the exclusive right to their respective writings and discoveries.' And in pursuance of the power thus delegated, Congress passed the act of the 31st of May, 1790 [1 Stat. 124, c. 15]. This is entitled 'An act for the encouragement of learning, by securing the copies of maps, charts, and books, to the authors and proprietors of such copies, during the times therein mentioned.' In the first section of this act, it is provided 'that from and after its passage, the author and authors of any map, chart, book or books, already printed within these United States, being a citizen, etc., who hath or have not transferred to any other person the copyright of such map, chart, book or books, etc., shall have the sole right and liberty of printing, reprinting, publishing and vending such map, book or books, for fourteen years.' In behalf of the common-law right an argument has been drawn from the word 'secure,' which is used in relation to this right, both in the Constitution and in the acts of Congress. This word, when used as a verb active, signifies to protect, insure, save, ascertain, etc. The counsel for the complainants insist that the term, as used, clearly indicates an intention not to originate a right, but to protect one already in existence. There is no mode by which the meaning affixed to any word or sentence by a deliberate body can be so well ascertained as by comparing it with the words and sentences with which it stands connected. By this rule the word 'secure,' as used in the Constitution, could not mean the protection of an acknowledged legal right. It refers to inventors as well as authors, and it has never been pretended by any one, either in this country or in England, that an inventor has a perpetual right, at common law, to sell the thing invented. And if the word 'secure' is used in the Constitution in reference to a future right, was it not so used in the act of Congress?"

It will thus be observed, then, that in this great case the Supreme Court has fully passed on all questions of common-law rights under the copyright law. Further in the opinion the court fully discusses Beckford v. Hood, supra, in which Lord Kenyon's decision was given, which is relied upon in the case at bar. We must therefore come to the conclusion that the courts of this country have long ago passed adversely upon the right to bring a common-law action under the section of the copyright law which is now before us. Under the copyright laws that now exist there can be no such right. As Judge Coxe has said in Sarony v. Ehrich, supra, "We must deal with the law as it is, not as it ought to be."

Demurrer sustained; the declaration adjudged insufficient at law.